**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**


AMIE LYNN SING                                                                    PLAINTIFF

V.                                                  NO. 4:07CV01162 JTR

MICHAEL J. ASTRUE,
Commissioner, Social
Security Administration                                                  DEFENDANT


**MEMORANDUM AND ORDER**

**I.  Introduction**

Plaintiff, Amie Lynn Sing, has appealed the final decision of the Commissioner of the Social

Security Administration denying her claim for Supplemental Security Income ("SSI").  Both parties

have filed Appeal Briefs (docket entries #12 and #13), and the issues are now joined and ready for

disposition.

The Court's function on review is to determine whether the Commissioner's decision is

supported by substantial evidence on the record as a whole and whether it is based on legal error.

*Long v. Chater,* 108, F.3d 185, 187 (8th Cir. 1997); *see also*, 42 U.S.C. § 405(g).  While "substantial

evidence" is that which a reasonable mind might accept as adequate to support a conclusion,[1]

"substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing

analysis:

> "[O]ur review is more than an examination of the record for the existence of
> substantial evidence in support of the Commissioner's decision; we also take into
> account whatever in the record fairly detracts from that decision."   *Haley v.*

---

[1] *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996).

*Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision." *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995).

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).

On March 4, 2005, Plaintiff filed an application for SSI, alleging disability since July 30, 2004, due to degenerative disc disease, neck and back pain, depression, anxiety, irritable bowel syndrome, and hypoglycemia.  (Tr. 42; 63-71.)  After Plaintiff's claims were denied at the initial and reconsideration levels, she requested a hearing before an Administrative Law Judge ("ALJ").

On November 16, 2006, the ALJ conducted an administrative hearing, where Plaintiff and a vocational expert ("VE") testified.  (Tr. 290-342.)  At the time of the hearing, Plaintiff was 34-years old and had finished one year of college.  (Tr. 301.)  Plaintiff's past relevant work included jobs as a travel agent, customer service representative, billing clerk, and a school secretary.  (Tr.302-16.)

The ALJ considered Plaintiff's impairments by way of the familiar five-step sequential evaluation process.  Step 1 involves a determination of whether the claimant is involved in substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(i) (2005).  If the claimant is, benefits are denied, regardless of medical condition, age, education, or work experience.  *Id.* at § 416.920(b).

Step 2 involves a determination, based solely on the medical evidence, of whether the claimant has an impairment or combination of impairments which significantly limits claimant's ability to perform basic work activities, a "severe" impairment.  *Id.*, § 416.920(a)(4)(ii).  If not, benefits are denied.  *Id.*

Step 3 involves a determination, again based solely on the medical evidence, of whether the severe impairment(s) meets or equals a listed impairment which is presumed to be disabling. *Id.*, §

416.920(a)(4)(iii).[2]  If so, and the duration requirement is met, benefits are awarded.  *Id.*

Step 4 involves a determination of whether the claimant has sufficient RFC, despite the impairment(s), to perform the physical and mental demands of past relevant work.  *Id.*, § 416.920(a)(4)(iv).  If so, benefits are denied.  *Id.*

Step 5 involves a determination of whether the claimant is able to make an adjustment to other work, given claimant's age, education and work experience.  *Id.*, § 416.920(a)(4)(v).  If so, benefits are denied; if not, benefits are awarded.  *Id.*

In her February 23, 2007 decision, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset date; (2) had "severe" impairments consisting of back pain and depression; (3) did not have a combination of impairments meeting a Listing; (4) was not entirely credible; (5) had the RFC to lift/carry 20 pounds occasionally, 10 pounds frequently; could sit/stand/walk for 6 hours in an 8-hour workday; could sit for 30 minutes and stand for 15 minutes continuously; could occasionally stoop, bend, and crouch; could perform work "where judgment is within limits due to pain," and tasks are learned by experience and performed with some variables and little supervision, "but more for non-routine work;" (6) could not perform her past relevant work because it required her to stand, walk, lift, and carry outside of her RFC; (6) was a younger individual, with a high-school education; (7) had no transferable work skills; and (8) could perform other work existing in substantial numbers in the national economy.  (Tr. 13-16.)   Thus, the ALJ concluded that Plaintiff was not disabled.  (Tr.17.)

---

[2]If the claimant's impairments do not meet or equal a Listing, then the ALJ must determine the claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence.  *Id.*, § 404.1520(e).  This RFC is then used by the ALJ in his analysis at Steps 4 or 5.  *Id.*

On September 28, 2007, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, thereby making it the final decision of the Commissioner.  (Tr. 3-5.)  Plaintiff then filed her Complaint appealing that decision to this Court.  (Docket entry #1.)

## II.  Analysis

In Plaintiff's Appeal Brief (docket entry #12), she argues that the ALJ erred: (1) in assessing her credibility; and (2) in assessing her RFC.  Before analyzing these arguments, the Court will review the pertinent hearing testimony and medical evidence.

### A.   Administrative Hearing Testimony and Medical Evidence

Plaintiff testified that she was a full-time student at Arkansas Tech University.  (Tr. 321.) She was a sophomore and  took 12 credit-hours on Tuesdays and Thursdays.  (Tr. 322.)  According to Plaintiff, after completing her first year of college, she was involved in a motor-vehicle accident in July of 2004 which caused her disability.    (Tr. 324.)

Plaintiff tired easily in walking between classes, and said that teachers accommodated her by allowing her to get up and walk and stretch during classes.  (Tr. 325.)  According to Plaintiff, she could not return to her past work due to the sitting requirement.  (Tr. 325-26.)  She could not sit for more then 15 minutes without pain and stiffness requiring her to get up and walk.  (Tr. 326.)  She could only walk for 80 feet before feeling "substantial pain" requiring her to rest.  (Tr. 327.)  Plaintiff described pain that went from her neck, down her back, and to her hip.  (Tr. 328.)

Plaintiff testified that her family physician, Dr. Dunn, had limited her from lifting anything. (Tr. 330.)  She related that it was very painful to lift her 4-month old infant to feed her.  (Tr. 330.)

Plaintiff acknowledged that in June her family drove to Illinois for a 5-day trip.[3]  (Tr. 331-32.)
Plaintiff's husband drove the family vehicle.  (Tr. 331.)

ER records reflect that on July 30, 2004, Plaintiff was involved in a motor-vehicle accident,
and was seen at the ER complaining of neck and mid-back pain.  (Tr. 131.)  CT scans of Plaintiff's
cervical and thoracic spine were normal, and Plaintiff was diagnosed with cervical strain.  (Tr. 132.)

On August 2, 2004, Plaintiff followed up with her family physician, Dr. Jacky Dunn,[4]
complaining of pain, stiffness, and numbness from her neck to her hip.  Dr. Dunn diagnosed Plaintiff
with acute cervical, thoracic, and lumbar strain.  (Tr. 217.)  Dr. Dunn noted that his physical
examination showed that Plaintiff had "significant" muscle spasm and "paravertebral muscular
fullness" in the cervical, thoracic, and lumbar spine.  (Tr. 217.)  Dr. Dunn prescribed muscle relaxers
and anti-inflammatory medication, and referred Plaintiff to physical therapy.

Over the course of numerous follow-ups with Dr. Dunn, Plaintiff continued to complain of
pain.  Dr. Dunn's notes reflect that Plaintiff had muscle spasm and "paravertebral muscular fullness"
on physical exmaination.  On September 24, 2004, Dr. Dunn changed Plaintiff's medications to
Norflex, Naproxyn, Darvocet-N, and placed her on a TENS unit.  (Tr. 211.)  On October 22, 2004,
Dr. Dunn referred Planitiff to chiropracor Mike Brown due to her "chronicity of symptomology."
(Tr. 206.)

On November 12, 2004, Dr. Dunn noted that "on physical examination [Plaintiff] continues
to have the paravertebral muscular fullness and spasm in the cervical region and the lumbosacral

---

[3]Although not established at the administrative hearing, various forms and medical records
indicate that Plaintiff resided in Pelsor, Arkansas, approximately 45 miles north of Russellville.

[4]Dr. Dunn is a Doctor of Osteopathy.

region," and referred Plaintiff for an MRI of the cervical/lumbar spine. (Tr. 204.) On December 2,

2004, Dr. Dunn wrote that Plaintiff's MRI showed no fracture of the lumbar spine, but that "the

cervical spine shows a posterior disc, osteophyte complex at C6 & C7 that effaces the anterior

epidural fat and flattens the anterior margin of the spinal cord."[5] (Tr. 203.)

On December 29, 2004, Dr. Bill Owens completed an "Arkansas Rehabilitation Services

Physician Consultant Worksheet."[6] According to Dr. Owens, Plaintiff had cervical disc disease that

was permanent and stable. (Tr. 120.) The form is checked to indicate that the condition could not

be removed by treatment, and a question mark is checked as to whether the condition could be

"substantially reduced by treatment." (Tr. 120.) In Dr. Owens's opinion, Plaintiff had "chronic and

significant" vocational limitations. (Tr. 120.) According to Dr. Owens, Plaintiff: (1) was not limited

in her ability to walk and stand; (2) was "limited" in her ability to stoop, bend, lift, reach, grasp, and

repetititively use her hands; and (3) should avoid pushing, pulling, climbing, strenuous labor,

overhead work, and prolonged fixation of her head and back in one position. (Tr. 120.)

On February 7, 2005, Dr. Dunn referred Plaintiff to Dr. Allison, an orthopedic surgeon. (Tr.

199.) On March 9, 2005, Dr. Dunn noted that Dr. Allison "told [Plaintiff] that he could not do

---

[5]Curiously, the administrative record does not appear to contain any radiology reports reflecting any MRI scans. However, Dr. Dunn noted that he was going to "review [the MRI] films with a radiologist." (Tr. 203.)

[6]It is unclear from the administrative record whether Dr. Owens treated or examined Plaintiff, or simply reviewed her medical records. The preprinted form, titled "Arkansas Rehabilitation Services Physician Consultant Worksheet," indicates that "[a]vailable treating physician reports were reviewed to complete this document." (Tr. 120.) Interestingly, the preprinted form also indicates that it is generated "for Arkansas Rehabilitation Services use only," and that "[i]nformation contained in this report should not be utilized for the purpose of treatment or the determination of eligibility for other public or private programs." (Tr. 120.) The ALJ's decision does not contain any discussion or acknowledgment of this record from Dr. Owens.

anything for her as it has been 8 months since the motor vehicle accident."[7]   (Tr. 197.) Dr. Dunn

wrote that he was "sure that [Plaintiff] probably tore the musculature in the intrascapular area and

this has caused the chronicity of [Plaintiff's] symptomaology."  (Tr. 197.)

On April 4, 2005, Dr. Dunn noted that Plaintiff was despondent and crying due to increased

financial difficulty, and the threat of lawsuits from "the hospital and also at our clinic." (Tr. 196.)

Dr. Dunn also indicated that "[Plaintiff] cannot work.  She is disabled as a result of the motor vehicle

accident."   Dr. Dunn observed that, on physical examination, Plaintiff "continues to have the

paraverterbal muscular fullness and spasm in the cervical region suprascapular area and of her

thoracic region." (Tr. 196.)  At the time, Plaintiff was taking Paxil, Mobic, and Darvocet. (Tr. 196.)

On April 19, 2005, Dr. Dunn changed Plaintiff's medications to Norflex, Flexeril, and Celebrex, and

changed her physical therapy regimen to the "Med-X program."  (Tr. 195.)

On July 5, 2005, PT Leigh Barborek reported that Plaintiff had made "unusually significant"

progress in her physical therapy under the "Med-X strengthening program." (Tr. 175.)  Plaintiff had

improved her range of motion on the cervical and lumbar machine to the maximum range of motion,

along with significant improvement on the "strength deficits" on the machines. (Tr. 175.)  In her last

therapy visit, on July 22, 2005, Plaintiff reported mild to moderate pain and stiffness in her neck, and

occasional tingling.  (Tr. 170.)

---

[7]It does not appear that there are any medical records from Dr. Allison in the administrative
record.  In Plaintiff's Appeal Brief, she also characterizes Dr. Dunn's March 9, 2005 note as
reflecting that she was involved in a second motor vehicle accident.  (*Pltff's App. Brf.* at 9.)  In this
note, Dr. Dunn indicates that he reviewed with Plaintiff the "mechanism of the injury," and includes
a description of a motor vehicle accident.  (Tr. 197-98.)  However, this description appears to relate
to Plaintiff's original July 30, 2004 motor vehicle accident, and not some subsequent accident.

On August 2, 2005, Plaintiff presented to Dr. Dunn with a positive pregnancy test, and Dr. Dunn discontinued Plaintiff's medications. (Tr. 190.) Over the course of several visits with Dr. Dunn during her pregnancy, Plaintiff is noted to have developed increased lower back pain due to lordosis from the pregnancy. (Tr. 263.) While Plaintiff remained off of her medications, she recieved permission from her OB-GYN to use her TENS unit.

On March 9, 2006, Dr. Dunn wrote a letter to Plaintiff's counsel in which he recommended that Plaintiff continue with physical and massage therapy, as well as use of a TENS unit. (Tr. 258-59.) Dr. Dunn noted that, because Plaintiff was being "required" to breast-feed her baby, she was not taking her muscle relaxers and anti-inflammatory medications. (Tr. 258.) On physical examination, Plaintiff showed significant spasm and "paravertebral muscular fullness" throughout the spine, on the right side greater than the left. (Tr. 258.) Dr. Dunn advised Plaintiff to remain off from work, but opined that she could continue her classes at ATU "as tolerated." (Tr. 259.)

On August 18, 2006, Plaintiff underwent an electromyography/nerve conduction study. (Tr. 274-71.) Neurologist David Oberlander commented that the study was relatively normal, with no evidence of motor neuron disease, myasthenia gravis, or peripheral neuropathy. (Tr. 275.) Dr. Oberlander's assessment was as follows:

> The clinical presentation, history and findings on examination of spasm in the neck and low back with prior injury suggests arthritic or degenerative changes in the back, perhaps with disc bulging. [Plaintiff] has an abnormal gait and reduced range of motion on exam in the neck and low back – further evidence for potential disc injury in the neck and low back. Detailed EMG was performed in clinic today. The length of duration – over two years now since the injury – suggests she has reached the point of maximum medical improvement. Her ability to handle objects and coins is quite normal as is his [sic] intellect.

(Tr. 273.) On October 31, 2006, Plaintiff brought Dr. Oberlander's report to Dr. Dunn, who wrote

that the "only problem is that [Dr. Oberlander] did no studies on her right upper or lower extremities. [Dr. Oberlander] reported this as being relatively normal of both upper and lower extremities. [Plaintiff] was informed that she needs to discuss this with her attorney since he did most studies on the right.  It appears this study is not accurate."[8]  (Tr. 276.)

**B.     Plaintiff's Grounds for Reversal**

Plaintiff makes two intertwined arguments challenging the ALJ's assessment of her credibility and her RFC.  Because the ALJ failed to perform a proper credibility analysis, in accordance with *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984), the Court need not address Plaintiff's closely related argument that the ALJ also erred in determining her RFC.

In evaluating a claimant's subjective complaints, an ALJ should consider, in addition to objective medical evidence, any evidence relating to a claimant's:  (1) daily activities; (2) duration, frequency, and intensity of pain; (3) dosage and effectiveness of medication; (4) precipitating and aggravating factors; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984).

The ALJ's decision is notable in that it fails to cite to *Polaski* or mention the *Polaski* factors, which the Eighth Circuit has prescribed as the "preferred practice."  *See Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007).  However, the ALJ's decision does cite Social Security Ruling 96-7p and

_____

[8]The basis for Dr. Dunn's criticism of Dr. Oberlander's report is unclear.  In apparent contradiction, Dr. Dunn writes that Dr. Oberlander did no studies on Plaintiff's right upper and lower extremities, but also that he did "most studies on the right."   It is also unclear whether Dr. Oberlander's report in fact reflects that there were no right extremity studies, or whether Dr. Dunn might have accepted a characterization from Plaintiff that Dr. Oberlander did no testing on her right side.  It goes without saying that the Court is not qualified to interpret the raw data on an EMG/nerve conduction study.  However, it appears to the Court that the report indicates at least some testing on Plaintiff's right side. (Tr. 274-75.)  The ALJ's decision does not address Dr. Dunn's criticism of Dr.  Oberlander's report.

20 C.F.R. 416.927 (*see* Tr. 14 ) "which largely mirror *Polaski*." *See Randolph v. Barnhart*, 386 F.3d 835, 842 (8th Cir. 2004).  It is also well-established that an ALJ need not explicitly discuss each *Polaski* factor in a "methodical fashion" as long as the *Polaski* framework is recognized and considered. *See Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006.)

In a combined discussion of Plaintiff's credibility and her RFC, the ALJ's decision contains the following recitation of the medical evidence:

> The medical evidence. . . reveals that [Plaintiff] was involved in a motor vehicle accident on July 30, 2004.  On December 13, 2005 [Plaintiff] is beginning to develop increased low back pain as a result of lordosis from her pregnancy.  In a follow up exam dated March 7, 2006, [Plaintiff] was noted to have had her baby on February 20, 2006 and it was noted that the [Plaintiff had] done very well.  In fact, [Plaintiff] went home after delivery on the same day.
>
> She started back to school on March 6, 2006.  Her neurologic examination is unremarkable. [Plaintiff] states that she has pain extending down into the area slightly inferior to the deltoid region on the left shoulder with no neuropathy of the upper extremities at this time.  She continued to use [a TENS unit] and states she has to use this 1 to 2 times a week.  She still cannot use muscle relaxers or anti-inflammatory medicines due to the fact that she is breast feeding.  In an office visit on March 9, 2006, Dr. Dunn stated that he advised [Plaintiff] to remain off work but she can continue her classes at ATU as tolerated trying to get in the remainder of the spring semester.
>
> On August 18, 2006. . . Dr. Oberlander indicated spasms in the neck and low back pain with prior injury suggests arthritic or degenerative changes in the back, perhaps with disc bulging.  She has an abnormal gait and reduced range of motion in the neck and low back, further evidence for potential disc injury in the neck and low back. . . [t]he length of duration, over two years since the injury, suggests that she has reached the point of maximum medical improvement.  Dr. Oberlander indicated that her ability to handle objects and coins is quite normal as is her intellect.  Both NCS and EMG were within normal limits.
>
> * * *
>
> The undersigned also takes note that [Plaintiff's] treating physician took her off work but said she could continue going to class as tolerated.  The undersigned finds that [Plaintiff's] ability to drive, go to class, care for an infant, [and] pass her courses is

not consistent with an individual who testifies she cannot work in fact, the undersigned that this shows her ability to do work.

(Tr. 14-15.)

This analysis is problematic for a number of reasons. The ALJ's discussion of the medical evidence is truncated and fails to address Plaintiff's extensive history with her treating physician, Dr. Dunn. The ALJ's decision suggests that Plaintiff developed back pain about a year and a half after her motor vehicle accident, as a result of her pregnancy. In fact, Plaintiff's medical history reflects that she complained to Dr. Dunn of neck and back pain immediately after the motor vehicle accident in July of 2004 and consistently thereafter.

On physical examination, Dr. Dunn consistently noted Plaintiff to have muscle spasm and "muscular fullness" surrounding her spine. As indicated earlier, there is also a suggestion from Dr. Dunn that Plaintiff's MRI results were consistent with a problem in her cervical spine. The ALJ's decision essentially overlooks Plaintiff's entire medical history in the time period between her motor-vehicle accident and her pregnancy. Additionally, the ALJ does not address what, if any, weight was given to the report of Dr. Bill Owens who opined that Plaintiff had "chronic and significant" vocational limitations. Finally, the ALJ appeared to place substantial weight on Plaintiff's EMG/nerve conduction study, but she did not address Dr. Dunn's criticism of the study as "inaccurate."

The preceding medical evidence of Plaintiff's neck and back problems may not be consistent with the degree of limitation alleged by Plaintiff. However, in weighing Plaintiff's credibility, the ALJ's decision contains *no discussion of this evidence whatsoever.* Thus, the Court concludes that substantial evidence does not support the ALJ's credibility analysis. Accordingly, this case must be

reversed and remanded for further proceedings consistent with this opinion.

### III.  Conclusion

On remand, the ALJ should reassess Plaintiff's credibility pursuant to the requirements of *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984).  Furthermore, the ALJ should also carefully update the medical record and ensure that she obtains and considers all of the medical evidence to support her RFC assessment.

IT IS THEREFORE ORDERED THAT the Commissioner's decision is reversed and this matter is remanded to the Commissioner for further proceedings pursuant to "sentence four," within the meaning of 42 U.S.C. § 405(g) and *Melkonyan v. Sullivan*, 501 U.S. 89 (1991).

DATED this 4th day of February, 2009.

_____
UNITED STATES MAGISTRATE JUDGE